# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

ANABEL REYES,                                   )
                                                )
                                                )
                Plaintiff,                      )
                                                )
v.                                              )          Civil Action No. _____
                                                )
PETER B. HEGSETH,                               )
in his official capacity as Secretary of Defense, )
                                                )
JULES W. HURST,                                 )
in his official capacity as Under Secretary     )
of Defense for Personnel and Readiness,         )
                                                )
JOHN C. PHELAN,                                 )
in his official capacity as Secretary of the Navy, & )
                                                )
BOARD FOR CORRECTION OF NAVAL                   )
RECORDS.                                        )
_____)

## COMPLAINT

The Department of Defense ("DoD") wrongfully discharged Anabel Reyes when it separated her from the Navy under Don't Ask, Don't Tell ("DADT"). The DoD then memorialized this injustice in her military discharge records and has refused—now more than a decade later—to fully correct Ms. Reyes's discharge records. To this day, the discriminatory military discharge record imposed by the DoD continues to inflict stigmatic, dignitary, and economic harms on Ms. Reyes.

Ms. Reyes's naval service began in 2007. After serving in the Junior Reserve Officer Training Corps ("JROTC") and the Navy Reserve, Ms. Reyes enlisted as an active-duty member of the Navy. Two years later, in 2009, the Navy discharged her under DADT because a superior officer violated policy by interrogating her about her sexual orientation and she confessed to being

- 1 -

a lesbian. When discharging Ms. Reyes under DADT, the DoD inserted into Ms. Reyes's military discharge records an unfavorable character of service, pejorative references to her sexual behavior, and an adverse code about her suitability to ever re-enter military service—all of which ended her military career prematurely and deprived her access to important veterans benefits, including Post-9/11 GI Bill education benefits.

Shortly after the DoD discharged Ms. Reyes, Congress repealed DADT. With that long-overdue policy change, Ms. Reyes sought relief from the Board for Correction of Naval Records ("BCNR"). However, the BCNR relied on certain provisions in a 2011 policy memo issued by the DoD—known as the Stanley Memorandum—to constrain its own power. The BCNR cited the Stanley Memorandum as precluding it from providing full relief to Ms. Reyes, as it has done for similarly situated veterans discharged under DADT. The Navy did grant Ms. Reyes partial relief by upgrading her character of service to "Honorable" and changing her military re-entry code. However, because of the Stanley Memorandum, the BCNR left in place on Ms. Reyes's military records a disparaging narrative reason for separation—which forces her to "out" herself to potential employers—and a military separation date that still prevents her from receiving full access to veterans' benefits, including G.I. Bill education benefits.

The BCNR decision and the Stanley Memorandum violate the Administrative Procedure Act because they deprive Ms. Reyes of her constitutional right to due process of law and the equal protection of the laws and because they are arbitrary and capricious and otherwise not in accordance with law. The Court should declare the offending provisions in the Stanley Memorandum unlawful, enjoin any reliance on those provisions, vacate the BCNR decision, and direct the BCNR to readjudicate Ms. Reyes's case utilizing its full statutory remedial authority. Ms. Reyes and all similarly situated lesbian, gay, and bisexual veterans deserve to be free of the

harmful effects of the discrimination the DoD perpetrated under the banner of DADT. Thirteen years after the end of DADT, it is time for the DoD to right these wrongs once and for all.

## II.    PARTIES

1.    Plaintiff Anabel Reyes is a veteran of the United States Navy. In October 2009, the Navy discharged her under DADT due to her sexual orientation. She is a resident of Massachusetts.

2.    Defendant Peter Brian Hegseth is the U.S. Secretary of Defense. In that capacity, he is responsible for overseeing all policies and functions of the DoD, including the Department of the Navy and the BCNR. Secretary Hegseth is sued only in his official capacity.

3.    Defendant Jules W. Hurst is the acting U.S. Under Secretary of Defense for Personnel and Readiness. The Under Secretary has authority to issue guidance and memoranda to the records corrections boards that govern their decision-making. His office is responsible for having issued the September 20, 2011 "Memorandum for Secretaries of the Military Departments" regarding the "Correction of Military Records Following Repeal of Section 654 of Title 10, United States Code" (henceforth referred to as the "Stanley Memo"). Acting Under Secretary Hurst is sued only in his official capacity.

4.    Defendant John C. Phelan is the U.S. Secretary of the Navy. He is statutorily empowered to correct any naval record to correct an error or injustice. He does this by acting through the Board for Correction of Naval Records, a civilian tribunal within the Department of the Navy that is charged with hearing and deciding the records-correction petitions of current and former naval personnel. Secretary Phelan is sued only in his official capacity.

5.    Defendant Board for Correction of Naval Records ("BCNR") is a civilian tribunal within the Department of the Navy charged with adjudicating the records-correction petitions of current and former naval personnel. The BCNR issued the final agency action here that denied Ms.

Reyes's requested relief regarding the narrative reason for her separation from the Navy and time in service.

## III.    JURISDICTION AND VENUE

6.      This Court has jurisdiction under 28 U.S.C. § 1331 because Ms. Reyes's claims arise under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–03, and seek redress for violations of federal law—namely, the Fifth Amendment to the U.S. Constitution, 10 U.S.C. § 1552, and 5 U.S.C. § 706(2).

7.      This Court has authority to grant the requested declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702–03, 706; Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; and Rules 56 and 57 of the Federal Rules of Civil Procedure.

8.      This Court has authority to grant the requested attorneys' fees and costs under the Equal Access to Justice Act, 5 U.S.C. § 504, 28 U.S.C. § 2412, and Rule 54(d) of the Federal Rules of Civil Procedure.

9.      Venue is proper in this Court, the U.S. District Court for the District of Massachusetts, pursuant to 28 U.S.C. § 1391(e)(1), as Ms. Reyes resides within the District.

## IV.    FACTUAL ALLEGATIONS

### A.  "Don't Ask, Don't Tell" Was a Discriminatory Policy That Forced Thousands of LGB Servicemembers Out of the Military.

10.      In late 1993, Congress enacted the policy known as "Don't Ask, Don't Tell" ("DADT"). National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103–160, § 571, 107 Stat. 1547, 1670–73 (1993) (codified before repeal at 10 U.S.C. § 654). The policy mandated the separation of any servicemember who had "engaged in . . . a homosexual act or acts," *id.* at 1671; publicly acknowledged being lesbian, gay, or bisexual, *id.* at 1672; or entered, or sought to enter, a same-sex marriage, *id.* In so doing, it disregarded the dignity, lives, and sacrifices of

thousands of LGB servicemembers.

11.    The military continued to actively enforce DADT for over seventeen years, until Congress and President Obama repealed the policy, effective September 20, 2011. *See* Don't Ask, Don't Tell Repeal Act of 2010, Pub. L. No. 111–321, § 2, 124 Stat. 3515, 3515–17 (codified at 10 U.S.C. § 654). By then, there was widespread agreement that DADT "undermine[d] our military readiness and violate[d] American principles of fairness and equality." *See* Statement on Certification of Repeal of the Department of Defense's "Don't Ask, Don't Tell" Policy, 2009 DAILY COMP. PRES. DOC. 2 (Jul. 22, 2011). LGB servicemembers have been legally allowed to serve openly in the military ever since.

12.    The U.S. military discharged at least 13,000 servicemembers pursuant to DADT. *Don't Ask, Don't Tell Resources*, U.S. DEP'T OF DEF., https://www.defense.gov/Spotlights/Dont-Ask-Dont-Tell-Resources/ [https://perma.cc/Q4KZ-P5TZ] (last visited Apr. 3, 2025, 11:57 AM).

**B. From a Young Age, Ms. Reyes Demonstrated Extraordinary Personal Conduct and Outstanding Military Service.**

13.    Ms. Reyes was born in 1983. She was thrust into a role of significant responsibility from a young age. Her mother suffered from diabetes and a heart condition, and her father suffered from alcoholism. As the oldest daughter, once Ms. Reyes became a teenager, she committed to helping her parents raise her four younger siblings—a commitment that only grew after her father passed away in 2001.

14.    Ms. Reyes saw joining the Navy as a way to serve her country, build a career, and support her family. She was also excited to follow in the footsteps of her older brother, who had served in the Navy himself. Ms. Reyes worked hard to obtain her high school equivalency and to meet the physical fitness requirements necessary for her to enlist. While she knew that, as a lesbian, she would have to conceal her sexual orientation because of DADT, Ms. Reyes accepted that doing

so was a necessary requirement if she wished to fulfill her dream of serving her country. Ms. Reyes began working toward that dream by enrolling in the Navy JROTC in 2001 as a high schooler and then joining the Navy Reserve in 2005. On July 25, 2007, Ms. Reyes finally fulfilled her dream by enlisting in the Navy as an active duty Sailor.

15.    Ms. Reyes made significant sacrifices to achieve her dream of serving in the Navy. In 2007, just after Ms. Reyes completed boot camp, her older brother called her to inform her that their mother was seriously ill. Ms. Reyes requested leave to spend time with their mother, but her request was denied. Tragically, her mother passed away just three days later. Although Ms. Reyes was heartbroken that she could not see her mother before she died, her commitment to her Navy career remained steadfast. Moreover, with both her parents having passed away, she became even more determined to support her younger siblings.

16.    Ms. Reyes was trained as a Navy Fireman, a position in which she developed technical skills and nurtured her passion for engineering and working with her hands. She was assigned in this capacity to serve on the USS Bataan. Chief Nahemer Morillo, Ms. Reyes's direct supervisor, could see that Ms. Reyes "loved the Navy and planned to stay for the long haul."

17.    Ms. Reyes's performance evaluations confirmed that she was a hardworking and effective Sailor. Fellow Sailor Lady Milla recalled that Ms. Reyes was "an observant learner" and "a great team player" who was "very reliable" and who had "a great work ethic." Furthermore, Ms. Reyes's chain of command consistently noted that she was a model Sailor. Captain Samuel Howard, the ship's commanding officer, recalled being "confident in [Ms. Reyes's] contributions to our mission" and noted that Ms. Reyes had a solid record of good behavior and hard work. Similarly, Chief Morillo observed that Ms. Reyes was "a great worker with a great attitude."

18.    Ms. Reyes cherished her service in the Navy. When she began dating another

female Sailor, mindful of DADT, she neither shared her sexual orientation with anyone nor engaged in any sexual conduct aboard the ship. Ms. Milla remembered Ms. Reyes as "very private about her sexuality," adding that there was "never any sexual conduct between Anabel and the other Sailor that should have raised eyebrows about Anabel's sexuality."

19.     The sole blemish on Ms. Reyes's otherwise perfect record was a minor Non-Judicial Punishment ("NJP") that she received for sitting on one side of her bunk while another Sailor lay on the opposite side of it using a computer—a punishment that was imposed because Sailors were not supposed to sit on each other's bunks. Both Captain Howard and Chief Morillo emphasized that there was no sexual conduct involved in the violation and that the incident gave no reason to question Ms. Reyes about her sexual orientation or her personal relationships.

### C. The Navy Discharged Ms. Reyes on Account of Her Sexual Orientation After a Superior Forced Her to Disclose It.

20.     However, several months after the NJP, the ship's master-at-arms, Senior Chief Tooker, began interrogating Ms. Reyes about whether she was involved in a relationship with a female Sailor. Senior Chief Tooker informed Ms. Reyes that he had proof that she was engaged in such a relationship. He stated that if she denied the relationship, she would be charged with making false statements and failing to follow orders.

21.     Senior Chief Tooker's interrogation placed Ms. Reyes in an impossible situation. She could continue to not disclose her sexual orientation as required by DADT, but she had been told that doing so would result in charges being brought against her. Or she could answer Senior Chief Tooker's questions truthfully, but doing so would result in her dismissal under DADT and the end of her naval career.

22.     Facing this dilemma, Ms. Reyes sought out the ship's Chaplain for advice. The Chaplain counseled her to disclose her sexual orientation and relationship to Senior Chief Tooker.

He reminded her of the risk that failing to be honest could result in her facing military criminal charges.

23.     Ms. Reyes chose honesty. She admitted to Senior Chief Tooker that she was a lesbian and that she was in a relationship with a female Sailor, while continuing to stress that she had never engaged in any sexual conduct while aboard the ship.

24.     Upon learning of Ms. Reyes's status as a lesbian, Senior Chief Tooker took steps that led the Navy to administratively separate Ms. Reyes under DADT.

25.     Both Captain Howard and Chief Morillo confirm that, but for DADT, Ms. Reyes would have continued her successful naval career and would have been Honorably discharged at its conclusion.

### D. DADT Wrongfully Injured Ms. Reyes by Assigning Her a Harmful Record.

26.     Upon discharging Ms. Reyes, the Navy issued her a form known as a "Certificate of Release or Discharge from Active Duty," commonly known by its form number as a "DD-214." A DD-214 is "probably the most important document relating to a veteran's military service." MARGARET KUZMA ET AL., MILITARY DISCHARGE UPGRADE: LEGAL PRACTICE MANUAL 85 (2021); *see also* MICHAEL SCHWILLE ET AL., SERVICE MEMBER SEPARATION: UPDATING THE DD FORM 214, at 5 (2019) ("DD Form 214 is the most recognizable and widely accepted way to document service in the military, containing the most information in the shortest possible space (typically one page)."). The information it contains determines whether a veteran can access benefits and services from all levels of government and from a variety of private actors, including community organizations, employers, lenders, landlords, and more. *See, e.g.*, *id.*; *DD Form 214 / DD214 / DD 214 DD Form 214, Discharge Papers and Separation Documents*, NAT'L ARCHIVES (May 21, 2024), https://www.archives.gov/personnel-records-center/dd-214.

27.    A DD-214 contains important information about a veteran's time in the military. This includes the veteran's Character of Service; Narrative Reason for Separation and associated Separation Code; Reentry Code; and Separation Date. KUZMA ET AL., *supra* ¶ 26, at 43.

28.    As a result of the information that the Navy placed on her DD-214, Ms. Reyes continues to experience ongoing harm because she cannot receive full G.I. Bill benefits nor keep her sexual orientation private.

### 1.  Character of Service

29.    A DD-214 documents a veteran's Character of Service. There are five main Characterizations of Service: "Honorable," "General (Under Honorable Conditions)," "Other Than Honorable," "Bad Conduct," and "Dishonorable." KUZMA ET AL., *supra* ¶ 26, at 50. "Honorable" is the most favorable Characterization, as it imparts the most dignity to veterans for their service and enables them to access the full complement of federal and state veterans' benefits. *See id.* at 38–42, 50.

30.    Characterizations other than "Honorable" carry substantial negative consequences. *See, e.g.*, *Discharge Upgrade and Military Records Corrections*, CAL. DEP'T OF VETERANS AFFAIRS (last visited Apr. 3, 2025), https://www.calvet.ca.gov/VetServices/Documents/Discharge %20Upgrades.pdf. Those who receive "General (Under Honorable Conditions)" discharges, for instance, are barred from receiving Post-9/11 G.I. Bill education benefits. KUZMA ET AL., *supra* ¶ 26, at 39 (citation omitted). Similarly, the punitive Characterizations of "Bad Conduct" and "Dishonorable" typically prevent veterans from receiving federal health care benefits for the period of service that resulted in the punitive discharge. *Id.* at 41 (citations omitted). Furthermore, a Characterization of "Dishonorable" triggers even harsher penalties, including an automatic bar to all federal benefits. *Id.* at 42 (citation omitted).

31.    Critically, because "Honorable" is the most common and most respected Characterization, any less-than-fully-Honorable Characterization raises serious questions about the nature of a veteran's in-service conduct. *See, e.g.*, KUZMA ET AL., *supra* ¶ 26, at 39–40; U.S. GOV'T ACCOUNTABILITY OFF., GAO-80-13, MILITARY DISCHARGE POLICIES AND PRACTICES RESULT IN WIDE DISPARITIES 45 (1980), https://www.gao.gov/assets/fpcd-80-13.pdf ("Many recipients of [less-than-honorable discharges] encounter prejudice in civilian life, and their opportunities for civilian employment and veterans' benefits are limited."); Army Board for Correction of Military Records, Decision No. AR20200004046 (Aug. 25, 2020) (noting that, at time of separation, applicant "understood she might expect to encounter substantial prejudice in civilian life if a general discharge under honorable conditions was issued to her").

32.    The Navy initially assigned Ms. Reyes the Characterization of "General (Under Honorable Conditions)." It was only several years later, after Ms. Reyes had petitioned the Navy for relief, that the Navy upgraded its description of her naval service to an "Honorable" Characterization.  But that relief only partially remedied the injustice perpetrated by the Navy.

**2.    Narrative Reason for Separation & Separation Code**

33.    A veteran's Narrative Reason for Separation and associated Separation Code are extremely important components of a DD-214. *See* KUZMA ET AL., *supra* ¶ 26, at 51. The Narrative Reason is a one- to five-word statement describing the basis for the veteran's separation. *Id.* The Separation Code is a three-letter designation that corresponds to the particular Narrative Reason for the veteran's separation. *Id.*

34.    Like their Character of Service, a veteran's Narrative Reason and Separation Code have important and substantial effects on a veteran's life after the military. Some of these effects are formal. For instance, the Department of Labor ties veterans' unemployment insurance

eligibility to a list of "acceptable" Narrative Reasons. *See, e.g.*, U.S. Dep't of Labor, Unemp. Ins. Program Ltr. No. 30-20, at 1 (Sept. 24, 2020), https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2020/UIPL_30-20.pdf. Likewise, the Department of Veterans Affairs ("VA") conditions most federal benefits on completion of one's minimum active-duty service—with exceptions only for those with certain "[a]cceptable" Narrative Reasons for Separation. *See* U.S. DEP'T OF VETERANS AFFAIRS, M-21-1 ADJUDICATION PROCEDURES MANUAL, pt. III, subpt. I, ch. 1, § B.1.a–.c (last updated Nov. 27, 2024).

35.    Other effects are informal. A few Narrative Reasons, like "Completion of Required Active Service," are accepted as standard, giving readers no reason to question a veteran's character or military career. *See, e.g.*, U.S. Coast Guard, CGPSCINST 1900.1A, *Certificate of Release or Discharge from Active Duty, DD Form 214*, encl. 1 at 20 (2017) (referring to "Expiration of Enlistment" and "Completion of Required Active Service" as "regular separations"); U.S. Dep't of Labor, *supra* ¶ 34, attach. I at 1. However, unusual or atypical Narrative Reasons cause readers immediate concern. Some, like "Serious Misconduct," "Pattern of Misconduct," and "Court-Martial," are negative on their face. *See* Cal. Dep't of Veterans Affairs, *supra* ¶ 30, at 1 (noting that veterans with reasons like these "may experience barriers in obtaining employment"). Others are more opaque and arouse suspicion simply by departing from the more standard Narrative Reasons. *See* KUZMA ET AL., *supra* ¶ 26, at 51. Indeed, nonstandard Narrative Reasons can cast doubt even on otherwise positive records. *See, e.g.*, Jennifer Andrus, *Advising Veterans: How the DD214 Is Crucial to Life After Military Services*, N.Y. STATE BAR ASS'N (July 13, 2022), https://nysba.org/advising-veterans-how-the-dd214-is-crucial-to-life-after-military-service/.

36.    The Navy initially assigned Ms. Reyes the Narrative Reason of "Homosexual

- 11 -

Conduct (Acts)." It was only several years later, after Ms. Reyes had petitioned the Navy for relief, that the Navy changed her DD-214's Narrative Reason from "Homosexual Conduct (Acts)" to "Secretarial Authority."

37.     However, the Narrative Reason of "Secretarial Authority" that the Navy assigned to Ms. Reyes stigmatizes her and exposes her to discrimination from potential employers. Employers are generally unfamiliar with "Secretarial Authority" as a Narrative Reason for Separation; they expect to see "Completion of Required Active Service" or a similar Narrative Reason when confirming a job applicant's veteran status. When they do not see such a Narrative Reason, they may become suspicious of and discriminate against the applicant.

38.     U.S. Government regulations reinforce these assumptions. For example, official U.S. Department of Labor guidance characterizes "Completion of Required Active Service" as an "Acceptable' Narrative Reason[]" and states that "Secretarial Authority" indicates "inaptitude." Unemployment Compensation for Ex-servicemembers (UCX) Program, 65 Fed. Reg. 8746, 8747 (Feb. 22, 2000).

39.     In addition to what U.S. government regulations state, any cursory Internet search would confirm to employers that "Secretarial Authority" connotes either discharge under DADT or discharge due to mental illness, both of which remain extremely stigmatized. *See, e.g.*, Do Ask, Do Tell, Do Justice: Pursuing Justice for LGBTQ Military Veterans (2018), www.legalservicescenter.org/wp-content/uploads/2012/10/Do-Ask-Do-Tell-Do-Justice-Summit-Report-June-2018.pdf (linking "secretarial authority" with DADT discharges); PBnJ, *AFBCMR Changed Discharge to "Secretarial Authority"?*, Physical Evaluation Board Forum (April 22, 2016),        https://www.pebforum.com/threads/afbcmr-changed-discharge-to-secretarial-authority.33710/ (discussing one servicemember's experience before the AFBCMR changing his

Narrative Reason for Separation from Personality Disorder to Secretarial Authority).

40.    The Narrative Reason for Separation on Ms. Reyes's DD-214 thus forces her to choose between forfeiting her privacy by "outing" herself to potential employers as a lesbian or risking being denied employment because potential employers make incorrect assumptions about her service in the military (e.g., that she was discharged due to inaptitude or a serious mental health condition). Furthermore, because homosexuality remains stigmatized, Ms. Reyes risks being subjected to discrimination if she does "out" herself to potential employers.

### 3. Reentry Code

41.    Another feature of a DD-214 is a veteran's Reentry Code, which determines the veteran's "future eligibility to enlist or reenlist after discharge or separation" from the military. Off. of the Naval Inspector Gen., U.S. Dep't of the Navy, *FAQs: What are Reenlistment Codes?*, https://www.secnav.navy.mil/ig/Lists/FAQs/DispForm.aspx?ID=641 (last visited Apr. 10, 2025, 11:52 AM).

42.    The Navy initially assigned Ms. Reyes the Reentry Code of "RE-4," which made her ineligible for reenlistment. *Id.* It was only several years later and after Ms. Reyes petitioned the Navy for relief that the Navy assigned her the Reentry Code of "RE-1," which made her eligible for reenlistment. *Id.*

### 4. Separation Date

43.    A veteran's Separation Date, which—in conjunction with their Entry Date— captures the amount of time that they served in the military, is vital to their post-service success because their eligibility for certain federal benefits hinges on the length of their service. *See, e.g.*, 38 C.F.R. § 3.12a (barring anyone "who does not complete a minimum period of active duty" from receiving any benefit from the VA, with few exceptions). Time-based benefits include certain

education benefits, *see* 38 U.S.C. § 3311(b); home loans, *see* 38 U.S.C § 3702(a)(2); and VA health care, *see* U.S. Dep't of Veterans Affairs, Basic Eligibility for VA Care (last visited Apr. 10, 2025), https://www.va.gov/healthbenefits/resources/publications/hbco/hbco_basic_ eligibility.asp.

44.     Ms. Reyes continues to suffer harm as a result of the Separation Date that the Navy assigned to her. She enlisted to serve in the Navy for four years and would have completed her full term of service but for the Navy's decision to discharge her under DADT. Ms. Reyes's current Separation Date precludes her from ever receiving access to certain benefits, including full Post-9/11 G.I. Bill education benefits, because the VA considers length of a veteran's military service to determine eligibility and benefits rates. *See* POST-9/11 GI Bill Eligibility for Active Duty Veterans, U.S. Department of Veterans Affairs (2018). Because the BCNR refused to change Ms. Reyes's Separation Date to reflect the minimum period for which she enlisted to serve, she will never be able to receive the full amount of these benefits.

45.     Together, these DD-214 fields—Character of Service, Narrative Reason for Separation, Separation Code, Reentry Code, and Separation Date—represent the most widely used, significant, and consequential pieces of information about a veteran's time in the military. It is critical that these fields do not unlawfully contain harmful information about a veteran.

[**Image:** Ms. Reyes's DD-214, split into two parts. In the upper part, a single red box identifies Ms. Reyes's Entry and Separation Dates (fields 12a and 12b, respectively). In the lower part, multiple red boxes identify Ms. Reyes's Character of Service (field 24), Separation Code (field 26), Reentry Code (field 27), and Narrative Reason for Separation (field 28). Ms. Reyes's Social Security Number and Date of Birth have been redacted per Local Rule 83.6.11]

### E. Congress Created Boards for Veterans to Seek Correction of Unjust Military Records.

46.     Recognizing that servicemembers' records may contain errors or injustices that cause them harm, Congress established records review boards so that veterans have an avenue to petition the armed forces to correct their records. Such boards fall into one of two statutory categories, each with unique powers.

### 1. Discharge Review Boards

47.     The secretaries of the military departments are required to establish boards that review discharges. 10 U.S.C. § 1553(a). These boards, known as the Discharge Review Boards ("DRBs"), *e.g.*, 32 C.F.R. § 581.2, §724.102, are empowered to "examine the propriety and equity" of a veteran's separation from the armed forces. 32 C.F.R. § 70.9(a).

48.     The DRB for the Navy is the Naval Discharge Review Board ("NDRB"). *See* 32 C.F.R. § 724.102.

49.     The NDRB has a relatively narrow remedial mandate. Specifically, the NDRB is authorized only to "change a discharge or dismissal" or to "issue a new discharge." 10 U.S.C. § 1553(b)(1).

50.     Decisions of the NDRB are "subject to review by the Secretary concerned," 10 U.S.C. § 1553(b)(1), and a party denied relief by the NDRB may petition the BCNR for the relief that the NDRB denied. *See* § 1553(b)(2).

### 2. Boards for Correction of Military or Naval Records

51.     Congress vests plenary authority in the secretaries of the military departments "to correct any military record" whenever "necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1).

52.     With few exceptions not relevant here, the secretaries make such corrections "through boards of civilians," *id.*, collectively known as the Boards for Correction of Military/Naval Records ("BCM/NRs"), *see e.g.*, 32 C.F.R. § 581.3, § 723.1.

53.     The BCM/NR for the Navy is the Board for Correction of Naval Records (BCNR).

54.     The BCNR possesses broad remedial authority. *See* 10 U.S.C. § 1552(a)(1). Its power "to correct any military record" includes, among other things, the power to upgrade the

character of a veteran's discharge, *see* § 10 U.S.C 1552(a)(4)(B), to vacate an adverse enlistment

or promotion decision, *see* § 10 U.S.C 1552(a)(2), and to grant clemency for a conviction by court

martial, *see* § 10 U.S.C 1552(f)(2). Notably, per its broad remedial authority, the BCNR possesses

the authority to grant a veteran constructive service time and to change a veteran's Narrative

Reason for Separation.

55.    If the BCNR fails to correct an injustice clearly presented in the record before it, it

acts in violation of its statutory mandate.

**F.    Ms. Reyes Continued to Suffer Harms After Receiving Partial Relief from the
NDRB, Leading Her to Petition the BCNR for Additional Relief.**

56.    In 2012, shortly after the repeal of DADT, Ms. Reyes represented herself *pro se*

and petitioned the NDRB for a change to her Character of Service from "General (Under

Honorable Conditions)" to "Honorable" and a change to her Narrative Reason for Separation from

"Homosexual Conduct (Acts)." The NDRB ordered that Ms. Reyes's Narrative Reason for

Separation be changed to "Secretarial Authority" but declined to upgrade her Character of Service

to "Honorable."

57.    In 2018, Ms. Reyes, now represented by *pro bono* counsel, once again applied to

the NDRB for a change to her Character of Service, and this time, the NDRB changed her

Characterization from "General (Under Honorable Conditions)" to "Honorable" and changed her

Reentry Code from "RE-4" to "RE-1."

58.    Because the NDRB granted only partial relief, Ms. Reyes continues to suffer harm

because of her Narrative Reason for Separation and her Separation Date.

59.    Having exhausted the administrative NDRB process, Ms. Reyes petitioned the

BCNR in 2020 to address those harms by changing her Narrative Reason for Separation from

"Secretarial Authority" to "Completion of Required Active Service," and changing her Separation

Date from "October 22, 2009" to "July 24, 2011," her anticipated contract completion date.

### G. The Stanley Memo Unlawfully Curtails the BCNR's Broad Remedial Power.

60.     The BCNR possesses broad remedial authority to "correct any military record." 10 U.S.C. § 1552(a)(1). If it fails to correct an injustice clearly presented in the record before it, it acts in violation of its statutory mandate.

61.     The DoD issues subregulatory guidance memoranda to the records correction boards to instruct them on how to review and decide veterans' applications, both procedurally and substantively. Like the other military boards, the BCNR relies on and applies such memoranda when making its decisions, treating them as binding.

62.     On September 20, 2011, following the repeal of DADT, Clifford Stanley, then the Under Secretary of Defense for Personnel and Readiness, issued a memorandum (the "Stanley Memo") setting forth the DoD's policy on the correction of military records for veterans discharged under DADT. While the Stanley Memo laudably provides for some forms of presumptive relief to be awarded to veterans dismissed under DADT, it unlawfully purports to prevent the BCNR from providing other forms of relief to such veterans.

63.     Specifically, the Stanley Memo instructs the BCNR to provide limited relief to servicemembers discharged under DADT, including (1) amending a veteran's Narrative Reason and Separation Code, (2) recharacterizing their discharge to Honorable, and/or (3) changing their Reentry Code. *See* Stanley Memorandum, Ex. 2, at 2.

64.     However, other than allowing for those limited forms of relief, the Memo explicitly instructs that other remedies are "not normally [to] be appropriate," *id.*, despite falling within the BCNRs' statutory mandate, *see, e.g.*, 10 U.S.C. § 1552(a)(1), (c)(1).

65.     The BCNR relies on the Stanley Memo as binding authority that governs the

BCNR's correction of records for veterans discharged under DADT. The BCNR itself acknowledges that the "guidance from the Under Secretary of Defense (Stanley) memorandum has been and continues to be applied to all cases under the DADT repeal policy." *See What Can I Do About My Don't Ask Don't Tell (DADT) Discharge Upgrade?*, Board for Correction of Naval Records, https://www.secnav.navy.mil/mra/bcnr/Pages/Spotlight.aspx (last visited Apr. 10, 2025). It trains its board members accordingly. *See, e.g.*, BCNR Training Slide, Ex. 3 ("Remedies other than discharge upgrades (i.e., constructive service credit, restoration of grade, etc.) [are] not normally appropriate.").

66.    In decision after decision, the BCNR has applied the Stanley Memo to deny relief to veterans that the BCNR would otherwise be statutorily empowered to provide. *See, e.g.*, BCNR Decision re Reyes (Jan. 2021), Ex. 1, at 2 (describing the Stanley Memo as "set[ting] forth the . . . current policies, standards, and procedures for correction of military records" related to DADT); BCNR Decision No. 2878-23 (May 8, 2023) (rejecting request for Narrative Reason of "Early Out" as "not supported by" the Stanley Memo, which itself "adequately addressed" "any injustice in Petitioner's record"); BCNR Decision No. 7645-21 (Jan. 13, 2022), at 1 (noting that Sailor's application was "reviewed under" both the DADT Repeal Act and the Stanley Memo). In response to multiple requests under the Freedom of Information Act (FOIA), the BCNR did not produce any records showing that it has ever offered relief beyond that which the Stanley Memo prescribes. Nor do the BCNR's publicly available decisions or other independent research resources reveal any such instances of the BCNR granting relief beyond the Stanley Memo's narrow confines.

67.    The Stanley Memo unlawfully curtailed the BCNR's power. This unlawful curtailment is evident from the restrictive language of the Memo, the BCNR's external and internal statements, and the BCNR's actual practices. The result is that thousands of LGB Navy veterans,

including Ms. Reyes, are unable to obtain remedies from the BCNR for the harms that DADT inflicted upon them—remedies to which they are otherwise statutorily entitled.

### H. Relying on the Stanley Memo, the BCNR Unlawfully Denied Ms. Reyes Further Relief, Causing Ms. Reyes to Experience Ongoing Harm.

68.    In support of her application to the BCNR, Ms. Reyes submitted a brief that discussed why the harms that her current Narrative Reason for Separation and Separation Date inflict upon her represent an "injustice" that the BCNR is statutorily empowered to correct. *See* 10 U.S.C. § 1552(a). Ms. Reyes also requested an in-person hearing, which the BCNR denied.

69.    In her brief, Ms. Reyes explained how her current Narrative Reason for Separation causes her harm. Ms. Reyes's current Narrative Reason, "Secretarial Authority," both exposes her to discrimination and forces her to choose between forfeiting her privacy—by "outing" herself to potential employers as a lesbian—and risking being denied employment because employers make incorrect assumptions about her service. Because the BCNR refused to correct Ms. Reyes's Narrative Reason—unless the Court provides relief—these harms will continue to plague Ms. Reyes for the rest of her life.

70.    Furthermore, in her brief, Ms. Reyes also explained how her current Separation Date continues to cause her harm. Because the VA calculates eligibility for various benefits based, in part, on a veteran's length of service, Ms. Reyes's current Separation Date precludes her from ever receiving certain benefits, such as full G.I. Bill education benefits. *See* POST-9/11 GI Bill Eligibility for Active Duty Veterans, U.S. Department of Veterans Affairs (2018). Because the BCNR refused to correct Ms. Reyes's Separation Date to reflect the full period for which she enlisted to serve, she will never be able to receive the full amount of said benefits absent judicial intervention.

71.    In reviewing Ms. Reyes's application for relief, the BCNR based its decision entirely on the Stanley Memo's unlawful restrictions. In its decision, the BCNR stated that Ms. Reyes's "allegations of error and injustice were reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board" and that "the Department of Navy's current policies, standards, and procedures for correction of military records following the 'don't ask, don't tell' (DADT) repeal" are "set forth" in "both" the "Don't Ask, Don't Tell Repeal Act of 2010, and the Under Secretary of Defense Memo of 20 September 2011...[i.e., the Stanley Memo]." *See* BCNR Decision re Reyes (Jan. 2021), Ex. 1, at 2. The BCNR also characterized "full relief as outlined in the DADT repeal policy" as only that relief authorized by the Stanley Memo (i.e., changing a Sailor's Characterization of Service, Reentry Code, Narrative Reason for Separation, and Separation Code). *See id.*

72.    Relying on the Stanley Memo, the BCNR stated that "corrective action is not warranted." *See id.* at 3.

73.    Apart from citing the Stanley Memo, the BCNR did not explain the reasoning behind its decision, making only conclusory statements rather than explaining how it actually reached its determination. For example, the BCNR declared that Ms. Reyes "failed to demonstrate" that her "case still presents the Board with a material error or injustice," *see id.* at 2, but it did not explain how she failed to make the requisite demonstration. Similarly, the BCNR also concluded that "mere speculative harm is not a valid basis or theory upon which to grant relief." *See id.* at 2. It never explained why Ms. Reyes's concrete harms described in the brief were "speculative."

74.    Ms. Reyes now brings this action to have the restrictions set forth in the Stanley Memo declared unlawful and to have the BCNR consider her application anew so that she and other veterans may seek and obtain relief from a BCNR that considers their cases on the merits,

without the Stanley Memo's unlawful constraints.

## V.     CLAIMS

### COUNT 1
### Procedural Due Process Violation
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(B)

75.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

76.     Under 5 U.S.C. § 706, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

77.     The Stanley Memo's restrictions are unlawful and should be set aside as "not in accordance with law" and as "contrary to constitutional right, power, privilege, or immunity" because they breach the procedural component of the Due Process Clause of the Fifth Amendment. The BCNR's decision relied entirely on the Stanley Memo's restrictions as its basis and therefore also violates 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(B) because it breaches the procedural component of the Due Process Clause.

78.     The government violates the procedural component of the Due Process Clause when it deprives an individual of a property interest without due process of law.

79.     The Stanley Memo's restrictions violate the procedural component of the Due Process Clause because they deprive Ms. Reyes of her property interest in receiving certain government benefits, including full G.I. Bill benefits, without due process of law. The restrictions prevent the BCNR from deciding whether to change Ms. Reyes's Separation Date (which is directly tied to her eligibility for certain benefits) based on the facts presented in Ms. Reyes's record, instead prescribing a predetermined outcome for her because of her membership in the group of veterans discharged under DADT.

80.     In reaching its decision, the BCNR relied upon the Stanley Memo's unconstitutional restrictions as the sole basis for its decision. The BCNR's decision was unconstitutional.

81.     The Stanley Memo's restrictions, the BCNR's decision, and the Board's denial of a hearing violate 5 U.S.C. § 706(2)(A)-(B) because they violate the procedural component of the Due Process Clause.

**Count 2**
**Substantive Due Process Violation**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(B)**

82.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

83.     Under 5 U.S.C. § 706, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

84.     The Stanley Memo's restrictions are unlawful and must be set aside as "not in accordance with law" and as "contrary to constitutional right, power, privilege, or immunity" because they breach the substantive component of the Due Process Clause of the Fifth Amendment. The BCNR's decision relied entirely on the Stanley Memo's restrictions as its basis and therefore also violates 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(B) because it breaches the substantive component of the Due Process Clause of the Fifth Amendment.

85.     The government violates the substantive component of the Due Process Clause when it deprives a person of a constitutionally protected liberty interest or fundamental right without having a sufficient state interest in doing so.

86.     The Stanley Memo's restrictions deprive Ms. Reyes of her liberty interest and fundamental right to privacy regarding her sexual orientation. The Stanley Memo's restrictions

categorically deny Ms. Reyes an opportunity to have her Narrative Reason for Separation changed from "Secretarial Authority" to "Completion of Required Active Service." The Stanley Memo thus "outs" Ms. Reyes's sexual orientation by ensuring that her military record will identify her as a LGB servicemember who was discharged under DADT. The Stanley Memo itself mandates that all such servicemembers receive "Secretarial Authority" as their Narrative Reason for Separation. The Stanley Memo's restrictions also "out" Ms. Reyes by forcing her to disclose her sexual orientation to prospective employers in order to explain her non-standard Narrative Reason for Separation. By ensuring that this "outing" information will remain on Ms. Reyes's record, the Stanley Memo's restrictions impermissibly deprive Ms. Reyes of her constitutionally protected liberty interest in maintaining privacy around intimate matters. This deprivation of privacy violates the Due Process Clause

87.    In reaching its decision, the BCNR relied upon the Stanley Memo's unconstitutional restrictions as the sole basis for its decision. The BCNR's decision itself was also unconstitutional because of its exclusive reliance on the Stanley Memo.

88.    Both the Stanley Memo and the BCNR's decision violate 5 U.S.C. § 706(2)(A)-(B) because they violate the substantive component of the Due Process Clause.

**Count 3**
**Equal Protection Violation**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(B)**

89.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

90.    Under 5 U.S.C. § 706, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

91.    The Stanley Memo's restrictions are unlawful and must be set aside as "not in

accordance with law" and as "contrary to constitutional right, power, privilege, or immunity" because they violate the Equal Protection component of the Fifth Amendment. The BCNR's decision relied entirely on the Stanley Memo's restrictions as its basis. The decision violates 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(B) because it breaches the Equal Protection component of the Fifth Amendment.

92.     The government violates the Equal Protection component in the Fifth Amendment when it deprives an individual of the equal protection of the laws or treats members of groups differently under the law without having a sufficient interest in doing so.

93.     The Stanley Memo's restrictions are unconstitutional because they deprive Ms. Reyes of the equal protection of the laws in violation of the Equal Protection component of the Fifth Amendment. They do so by categorically barring her and other servicemembers discharged under DADT—who are, by definition, LGB or presumed to be LGB—from obtaining relief from the BCNR that remains available to non-LGB servicemembers.

94.     In reaching its decision, the BCNR relied upon the unconstitutional Stanley Memo's restrictions as the sole basis for its decision. The BCNR's decision was thus unconstitutional.

95.     Therefore, both the Stanley Memo's restrictions and the BCNR's decision violate 5 U.S.C. § 706(2)(A)-(B) because they violate the Equal Protection component of the Fifth Amendment.

**Count 4**
**10 U.S.C. §1552 Violation**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**

96.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

97.     Under 5 U.S.C. § 706, courts must "hold unlawful and set aside agency action" that

is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

98.    The Stanley Memo's restrictions are unlawful and must be set aside as "not in accordance with law" and as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because they unlawfully constrain the broad remedial power that 10 U.S.C. § 1552 vests in the BCNR. Because the BCNR's decision relied entirely on the Stanley Memo's restrictions as its basis, it also violates 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(C). The BCNR's decision further violates 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(C) because it violates 10 U.S.C. § 1552 by failing to correct an injustice clearly presented in the record before it.

99.    Executive action violates an agency's organic statute when it purports to limit, constrain, or restrict the agency's ability to exercise the power statutorily vested in it by Congress. Additionally, a BCNR decision violates 10 U.S.C. § 1552 when it fails to correct an injustice clearly presented in the record before it.

100.    The Stanley Memo's restrictions violate 10 U.S.C. § 1552 because they unlawfully constrain the BCNR's statutory powers. Under 10 U.S.C. § 1552, Congress vested the BCNR with the broad remedial authority and duty to "correct any military record" when "necessary to correct an error or remove an injustice." *See* 10 U.S.C. § 1552(a)(1). The Stanley Memo's restrictions curtail the BCNR's inherent statutory power to "correct any military record" by limiting the relief that can be afforded to Ms. Reyes and other veterans discharged under DADT. In so doing, those restrictions violate 10 U.S.C. § 1552.

101.    In reaching its decision, the BCNR relied upon the Stanley Memo's restrictions as

the sole basis for its decision. The BCNR's decision thus violated 10 U.S.C. § 1552 as well.

102.     The BCNR's decision also violated 10 U.S.C. § 1552 for a second reason. Upon reviewing Ms. Reyes's application for relief, the BCNR failed to correct an injustice clearly presented in the record before it, in direct violation of its statutory mandate. There is a clear injustice in Ms. Reyes's record: She continues to suffer concrete harm due to her current Narrative Reason for Separation and her Separation Date. By failing to correct that injustice, the BCNR violated its statutory mandate under 10 U.S.C. § 1552.

103.     Therefore, both the Stanley Memo's restrictions and the BCNR's decision violate 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(C) because they violate 10 U.S.C. § 1552.

**Count 5:**
**Arbitrary and Capricious**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

104.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

105.     Under 5 U.S.C. § 706, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

106.     The Stanley Memo's restrictions violate 5 U.S.C. 706(2)(A) because they are "arbitrary" and "capricious." The BCNR's decision relied entirely on the Stanley Memo's restrictions as its basis, and so it also violates 5 U.S.C. 706(2)(A), in that it is also "arbitrary" and "capricious." The BCNR's decision further violates 5 U.S.C. 706(2)(A) by being "arbitrary" and "capricious" because the BCNR failed to articulate a rational connection between the facts found and the choice made and because the BCNR failed to correct an injustice clearly presented in the record before it.

107.     Agency action is arbitrary and capricious when an agency fails to articulate a

rational connection between the facts found and the choice made. In addition, a BCNR decision is arbitrary and capricious if it fails to correct one or more injustices clearly presented in the record.

108.    The Stanley Memo's restrictions are arbitrary and capricious (1) because the Stanley Memo fails to articulate a rational connection between the facts found and the choice made and (2) because the restrictions prevent the BCNR from correcting an injustice clearly presented in the record.

109.    In reaching its decision, the BCNR relied upon the Stanley Memo's arbitrary and capricious restrictions as the sole basis for its decision. The BCNR's decision was thus arbitrary and capricious.

110.    The BCNR's decision was also arbitrary and capricious aside from its reliance on the Stanley Memo. First, the BCNR declared that Ms. Reyes "failed to demonstrate" that her "case still presents the Board with a material error or injustice," *see* BCNR Decision re Reyes (Jan. 2021), Ex. 1, at 2. However, it did not explain how she had failed to make the requisite demonstration. Moreover, the BCNR concluded that "mere speculative harm is not a valid basis or theory upon which to grant relief" *see id.* However, the BCNR never explained why it found Ms. Reyes's harm to be speculative, despite Ms. Reyes's explanation of how her current DD-214 causes her concrete harm. Therefore, because the BCNR failed to establish a rational connection between the facts found and the choice made, its decision was arbitrary and capricious.

111.    Second, the BCNR's decision was arbitrary and capricious because, in failing to award Ms. Reyes full relief, the BCNR failed to correct an injustice clearly presented in the record before it. There is a clear injustice in Ms. Reyes's record: she continues to suffer concrete harm due to her current Narrative Reason for Separation and her Separation Date. By failing to correct that injustice, the BCNR acted arbitrarily and capriciously.

112.    Therefore, both the Stanley Memo's restrictions and the BCNR's decision violate 5 U.S.C. § 706(2)(A) because they are arbitrary and capricious.

## VI.    PRAYER FOR RELIEF

Ms. Reyes respectfully requests that this Court:

A.    Declare that:

i.    the Stanley Memo's restrictions violate the Fifth Amendment and 10 U.S.C. § 1552, and are therefore invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)–(C);

ii.    the Stanley Memo's restrictions are arbitrary and capricious, and are therefore invalid under the APA, 5 U.S.C. § 706(2)(A);

iii.    the Board for Correction of Naval Records' ("BCNR's") decision as to Ms. Reyes violates the Fifth Amendment and 10 U.S.C. § 1552, and is therefore invalid under the APA, 5 U.S.C. § 706(2)(A)–(C); and

iv.    the BCNR's decision as to Ms. Reyes is arbitrary and capricious, and is therefore invalid under the APA, 5 U.S.C. § 706(2)(A);

B.    Permanently enjoin Defendants:

i.    from using or relying on the Stanley Memo's unlawful restrictions, and to withdraw the same;

ii.    from categorically prohibiting specific remedies for former servicemembers seeking to correct records affected by DADT or its predecessors, and from categorically denying specific remedies to the same, under the Stanley Memo and other, similar rules or policies;

iii.    from issuing or observing any other rule or policy that denies full, individualized

consideration of records-correction requests submitted by former servicemembers affected by DADT or its predecessors, or that impairs the ability of the BCNR to determine what constitutes an "error or injustice" in that context;

C.    Remand Ms. Reyes's case to the BCNR for reconsideration using the correct legal standards;

D.    Award Ms. Reyes reasonable attorneys' fees and costs in this action; and

E.    Grant any other relief this Court deems just and proper.

Respectfully submitted,

Anabel Reyes,

By her attorneys,

/s/ Dana Montalto
Dana Montalto BBO#687436
Daniel L. Nagin BBO#601058
Casey Nakamura*
Madhuri Venkateswar*
VETERANS LEGAL CLINIC
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
 (617) 384-0711
dmontalto@law.harvard.edu

Dated: April 22, 2025

*motions for law student appearance forthcoming